And so we'll proceed to the first case, United States v. Nordlicht and Levy. Thank you, Your Honor. Lauren Albert from the United States. Before I start, the court's clerk informed me he was only able to give me three minutes for a rebuttal, and we would respectfully request four. Thank you. Thank you, Your Honor. May it please the Court. Neither Rule 29 nor Rule 33 affords district courts the authority to reweigh evidence and set aside a jury's verdict simply because it prefers a different outcome. The district court's orders granting Defendant David Levy's motion for a judgment of acquittal under Rule 29 and both Levy and Defendant Mark Nordlicht's motions for new trials under Rule 33 should be vacated and the underlying convictions reinstated, because here the district court overstepped the limits on its discretion to vacate a jury verdict by substituting its own subjective view of the evidence for that adopted by the jury. I'm first going to address the court's Rule 29 order as to Levy, and then I'll turn to the Rule 33 orders. The Levy order's primary error was that it failed to give a jury a verdict. I'm going to ask you a very simple question asked by someone who is unusual in this regard, in that I was never an assistant U.S. attorney. It's hard to believe I made it this far without being one. You really don't have to answer this, but how do you decide in a case like this? This is New York. We see many more than we should, but lots of alleged fraud cases. How does one go about deciding whether it will be pursued civilly or criminally? There's something about this that had, to me, a flavor of somebody who got themselves in a terrible deal, allegedly cheated their way out of it. I wonder how do we arrive at a criminal case rather than a civil case? I suppose perhaps attached to that is my other question. What do you mean? I've seen it throughout the papers. What do you mean by criminal intent? What does that mean, in or out of this context? Sure, Your Honor. I'll note that this case was subject to considerable civil litigation, so it's not as though it was only dealt with criminally. There was civil litigation in Texas, and the SEC also has a case relating to these facts. I can't speak for the Justice Department as a whole, but I think that here we have individuals who lied to the investing public, who issued a consent solicitation relating to these bonds that misrepresented their holdings, that claimed that this transaction would be conducted in accordance with the law, knowing that that wasn't what was going to happen. In my view, at least, the stark wrongfulness of the conduct, the degree to which it was essentially predatory upon unsuspecting, unaffiliated investors, is what gives rise to it being worthy of criminal prosecution. It satisfies the willfulness part. Right. When we speak to criminal intent, we're speaking about willfulness, not just aggressive business practice, but instead, doing something that you know is wrong and unlawful. That's the elevated standard that, as a criminal fraud prosecutor, we have to meet, and we believe we met it in this case. What was the loss, and is that a factor, the amount of loss? Well, it depends on how you want to characterize loss. There's 150 bonds outstanding. Some number of bondholders decided to tender about $11 million in response to the consent solicitation. By tendering, they gave up their right to obtain a few additional months of interest payments. So, for that group, you could say that they were kind of misled into giving up those additional months of interest payments that they were otherwise entitled to. But then we also have this group of unaffiliated investors who did not tender, who chose to vote essentially no to the consent solicitation. Those people made their choice based on false information about how they understood this vote was going to be conducted and the legitimacy of the vote. So, for those individuals, they lost the entire value of their investment. I would have to do some arithmetic to get you that number, but it would be the $150 million total minus the number of people who lost the entire value of their investment. It's between $60 or $70 million, I thought, because it was half. That sounds about right, Joselia. Thank you. May I ask a question? What is the evidence with respect to Mr. Levy that he not only understood that platinum and beechwood were affiliates, but also understood the control provision in the indenture, also understood that it was important to disclose the affiliation between beechwood and platinum? Because I think that that's really the core, to me, of the intent issue. Sure. So, Mr. Levy is one of the sort of three individuals, him, Dan Small, and Mark Nordlicht, who are kind of running the and in that capacity, he receives the same email from Black Elk's lawyers that the other individuals receive that advises them, includes the provision about the affiliate rule and what bonds need to be disclosed and the definition of affiliate. And so, he's put on notice through that of how Black Elk was obligated to disclose the number of bonds held by affiliated parties. In terms of his knowledge of the fact that beechwood and Black Elk were, in fact, affiliates, and this goes to kind of one of the areas that we feel the district court overlooked or insufficiently valued in conducting its analysis of the evidence against Levy, is sort of the contextual big picture of Levy's role. He is a senior-level employee of both platinum and Black Elk simultaneously, or in beechwood, sorry, simultaneously during this period. He's a longtime employee of platinum, worked closely with Mark Nordlicht and Dan Small, started in 2011. During his time there, he had primary responsibility for the fund's investment in Black Elk, which was the fund's biggest, largest investment. He leaves in early 2014, and his place is the chief investment officer at beechwood. So, he's the most senior investment decision maker at beechwood during this time. But while he's in that capacity, he's still simultaneously working at platinum. Beechwood is being induced to invest in a whole host of places where platinum was invested, and it's not as though, you know, beechwood and platinum both invested in IBM. These are privately held, private equity type investments that platinum makes. They shift over to beechwood's books. The question, we started out with a discussion, in one sense, about willfulness. The question to me, with respect to intent, is whether he understood that by moving these funds to beechwood from PPVA and from platinum, and by not disclosing that beechwood was affiliated in the way that it was with platinum, that that was a material omission, and that that needed to have been disclosed to the bondholders. So, what you spent a lot of time doing is, in your brief, is talking about how, in fact, platinum and beechwood are affiliated. I don't care, in one sense. Okay, they're affiliated. But the question to me is, does he know that failing to disclose the affiliation is part of a scheme and that it should have been disclosed? I would submit that he does, by virtue of the fact that this would have passed without fraud, right? What the consent solicitation was asking the bondholders to do was to subordinate their interests and their rights to third parties, the holders of the preferred equity, in exchange for nothing. And we presented two unaffiliated bondholders, Todd Polvino and Dickson Yee, at trial, who testified to this, that this is a decision that would make no sense to a reasonable investor. This is a little bit of a sideshow, but there were $600,000 worth of bonds that were, if you believe those guys, those bondholders made a totally irrational choice. Then there were the $11 million that were tendered, but there were $600,000 that were not tendered. Was that irrational? I don't have an explanation for you, other than to say that we have a total number of 150 million bonds, and we have only 600,000 unaffiliated bondholders who voted yes. So we're talking about a tiny fraction of the bondholders who voted in that irrational way. Two witnesses, a tiny, totally irrational fraction. Okay, yes. Whether they hit the wrong button, whether they got that advice, whether they didn't understand the nature of the deal, I don't know. But we're talking about a really inference that this would be an irrational decision for a reasonable investor. So would you go back to this question, then? Yeah, sure. So we have this proposed amendment to the indenture that's going to allow Black Elk to pay the preferred equity, and there's just no way that that would have passed without fraud. Because if the Beechwood bonds and Platinum's other holdings had been disclosed in the consent solicitation and thereby excluded from the vote, the deal never would have gone through. So in order for them to have the— Back to the count for a moment. How many unaffiliated bondholders voted no? I'd have to do some arithmetic on that. I might have to see if one of my co-counsel can do it. I can give you the numbers. We have 150 million outstanding. We have 18.3 held by PPVA. We have Beechwood. 11 million tendered. If you add up all of those, it's the remainder. I just haven't done the math on that in advance. I apologize. Thank you. So you have this transaction that you know isn't going to go through absent fraud, because there would have been no way to get enough votes for it to pass. And then you have the evidence of the correspondence leading up to the consent solicitation, where you have Levy, Small, and Nordlicht, this small group of people tracking the bonds, which bonds are held by the various platinum entities and the various Beechwood entities, and in one instance, actually doing the calculation, right? We see the chart in the lower right-hand corner. They do the math of, okay, if we take out the 18.3 owned by PPVA, here's what we're left with. Is that the chart in your brief, or is that— Yes. Page 70. Page 70? Got it. Yes. And if you take that out, do we still have more than half? So that shows that they know that all these bonds are going to vote yes, because they control them, and that those bonds, if they're able to be counted, because they only disclosed 18.3, that's how they get to pass. I mean, they themselves are essentially assuming that they're not going to get— Is that what the government pointed to as evidence of Mr. Levy's role in Beechwood voting its bonds? No. In terms of Mr. Levy's role in Beechwood voting its bonds, I think that, you know, again, we have him sort of participating in the plans for the transaction in the correspondence leading up to the deal. You have him copied on all these emails, tracking the placement of the bonds, and then we have him copied and blind copied on the emails from Beechwood employees actually voting the bond, the emails to Nomura and Credit Suisse actually voting the bonds held by Beechwood. So that's a different category of correspondence. So if I can just make—I will shift to the Rule 33 orders. So as I kind of led off saying, the primary error, as we see in the Levy order, was that the district court didn't look at the evidence collectively. Instead, it isolated these buckets of evidence, the correspondence he reviewed and intent evidence. The district court did not have the benefit, I believe, of the Archer decision. That's true. That's true, Your Honor. Would you like me to turn to the Rule 33 argument? Sure. Okay. So in terms of the Rule 33 orders as to Nordlicht and Levy, as Your Honor just identified, this court recently issued its decision in Archer, which synthesized earlier case law into a more succinct standard, ruling that a new trial order can issue in limited circumstances on grounds of evidentiary deficiency where the evidence preponderates heavily against the verdict to such an extent that it would be a manifest injustice to let the verdict stand. And the court there emphasized that district courts are not authorized to reweigh the evidence and set aside the verdict simply because they feel some other result would be more reasonable. And specifically, the court emphasized the importance of district courts deferring to jury's resolutions of conflicting evidence, explaining that absent a situation where evidence was patently incredible or defied physical realities, the court must defer to that resolution. And so I think in connection with the Rule 33 orders— the, quote, opportunity, close quote, to examine his decision in light of Archer. We don't think so. And yeah, we don't believe remand would be appropriate. And here's why. First of all, Archer doesn't articulate a brand new rule. It's kind of a re-articulation and clarification of pre-existing case law, some of which was cited by the district court in this case. And really, the ultimate test is whether there was a manifest injustice at the trial. Manifest means obvious. If there was some obvious injustice that took place at the trial, Judge Kogan would have been able to identify that and have that be the basis for his Rule 33 decision rather than what we see in the order itself, which is essentially Judge Kogan opting to draw a less incriminating inference from the evidence than that that was drawn by the jury in this case. And I'd note that the Archer decision itself did not remand that case back to Judge Kogan. And that's what we believe would be appropriate here as well. So in the... Sorry, go ahead. You go ahead. I was going to say, why don't you wrap up? I will. Just two very final, very quick points. First, the Rule 33 order as to Levy essentially gives no justification or explanation and essentially provides no basis for affirmance. And as to Norlicht, the opinion makes clear what we were just discussing about the district court opting for a different inference when you review it kind of side by side in the chart that we have on pages 86 and 87 of our opening brief. And you can see the judge adopts an incriminating inference on Rule 29. Maybe for rebuttal, would you find out for me the specific site where, as I understand what you said, the Black Elk lawyer apprised or informed Mr. Levy in particular of this affiliate and control provision? Yeah. It's at Government Appendix 636. He receives an email in July 2014 with the advice from Baker Hostetler regarding the application of the affiliate rule. Thank you. Thank you. Unless anyone has any further questions, I'll save my time. Thank you. We'll hear from Defense Counsel. Mr. Burke, I guess you're going first. Yes, Your Honor. Good morning to the panel. May it please the Court. Good morning. So I'd like to just start with a just quick background that I think is important for understanding the context in which Judge Kogan made his decision on the Rule 33 for Mark Norlicht. This was a nine-week trial in terms of the beginning of openings through summations. Exactly one week or so was spent on the Black Elk case or scheme. The other eight weeks were spent on the other alleged scheme that the defendants were acquitted on. So the reason why I mention that is because I think it's important to understand the context in which Judge Kogan is seeing this entire case and seeing the outcome of this case. The other thing I'd mention is that Judge Kogan, this is only the second time that we've found in his entire very illustrious career of 15 years, almost on the bench, that he has granted Rule 33. And the reason I mention that again is because I think that what the government is doing in its brief and attempting to overturn the decision is to actually take the very, very careful analysis that he goes through in his opinion and turn it on its head and make it actually a detriment. They're criticizing him for being so careful of the evidence. And clearly, from our perspective, he makes a distinction between Rule 29 and Rule 33, which has to exist, because Rule 29 and Rule 33 serve different purposes. And of course, if they had the exact same standard, which is effective with the government's arguing, then you'd have a double jeopardy problem on a Rule 33 because you couldn't order a new trial if it had the same standards as Rule 29. So clearly, they're different standards. And the question is, how do you apply it? Now, as the panel noted, Judge Kogan obviously did not have the benefit of Archer at the time that he made his decision, but he did have the benefit of Ferguson. And Ferguson clearly survives Archer, expressly stated in the Archer opinion. And moreover, from our perspective, it's clear, although he doesn't use the exact language preponderance heavily because that wasn't what was in Ferguson and other cases at the time, it's clear to us that that is effectively what he found. And from our perspective, the Rule 29 is incorrect. We don't agree with his analysis. We can't appeal it, of course, at this point, because there's no final judgment. But we think it's very relevant to understanding how he came out on Rule 33. So on Rule 29, his view, which again, we disagree with the application, but clearly, he drew all inferences in favor of the government. And from what that means, and that's clear from the case law, this has been happening for decades, it means to take all the evidence that points to guilt, decide whether or not there's a reasonable jury could find that there's an inference of guilt. And if there is, the government prevails, the verdict stands. That's the way he looked at it. And it's very important that if you look at his Rule 29 analysis, he goes through many pages of explaining why he believes that there was a rational basis that a reasonable inference could be drawn for guilt. But he does not discuss the key critical testimony of two witnesses, the government's own witnesses, who said that Mark Nordlich did not control Beachwood. He does not reference that for a good reason, because he's applying only the inferences for Rule 29 that a rational jury could come up, could come up with. There is some evidence in the record that Nordlich did control Beachwood. I mean, so yeah, there may be some conflicts in the evidence, but those conflicts should be resolved in favor of the government. And Judge Shannon, that's exactly what Judge Kogan did for the Rule 29 purposes. And again, he resolved it exactly that way. He said on Rule 29, again, we disagree, but that on Rule 29, that we resolve in favor of the government. But what he was doing on the Rule 33... Do you disagree or does your client disagree that on this record, the jury could have found that there was indeed a scheme to rig the vote? Yes, we do disagree with that. And the reason we disagree with that is because there was... Why would bondholders have approved the amendment to the indenture when it was of no benefit to them and it put them behind the equity holders? I mean, why would any rational bondholder do that? Well, Your Honor, I think that there are lots of reasons why. We don't know. There's nothing... Give me a couple. Name a couple. A couple could be that if a bondholder has an interest in another entity that will be benefited by the asset sale, that actually their economic interest would be furthered more by agreeing to the consent solicitation, but not in fact tendering. It could be that you have multiple different investments and the investments... In fact, that is the case with some of the investments that were involved here. There were overlapping investments, overlapping people. Again, that doesn't go to control in our view. I mean, maybe those are possible explanations, but couldn't a reasonable jury find that no rational bondholder would have approved this element? And if so, then we need to assume that's what the fact showed. Well, Your Honor, I think the question I think Judge Kogan addresses this issue is that whether or not this was... That there was some kind of effort to ensure... In fact, the lawyer, Mr. Scherer at Baker Hosteller, said this expressly at the trial. The purpose of this was to get the asset sale amendments approved. That was the purpose. And so the fact that that alone was the purpose and that some bondholders might like to do it, some might not, is not really relevant to the ultimate question of whether or not there was an actual proof that Mark Nordlich via Platinum controlled Beechwood. And the point that Judge Kogan makes very forcefully is that there is no evidence. And these are the words he uses, Your Honor. He says no evidence that there was actual control or even potential control of Beechwood's management or policies. Well, what about Mr. Burke? Good morning, but what about the evidence of these emails and so on that appear to instruct Mr. Levy, while he's at Beechwood, to do certain things? And those are, I think, coming from Mr. Nordlich. Yes, Your Honor. I actually think that the evidence there, and that's again addressed in the Rule 29 portion of Judge Kogan's analysis, that goes to, and we're not disputing that Mark Nordlich had the power to conduct certain investments for Beechwood. That was undisputed. He was one of the founders. He had some people who were overlapped. No question. The question, though, under the specific language of the Trust Indenture Act, as well as the indenture at issue here, was whether or not that constitutes control of management and policy. And what Judge Kogan found was that there was no evidence that that alone, that the fact that he had some influence over investment decisions, that he asked or directed people to buy black elk bonds, that alone showed that he had control. And the reason for that is because, as the case law we've cited in our brief shows, that if, control really means control, it means that you can actually direct and nobody can stop you. You can't be vetoed. You can tell somebody to do something, they have to do it. And there was no evidence in this record to suggest that at all. In fact, the evidence was all to the contrary. Two government witnesses, Your Honor, said that Mark Nordlich did not control Beechwood. And that was undisputed by the government. The government did not cross-examine them on that, did not try to Was he not convicted of a conspiracy charge? In other words, so the fact of control is in one sense, as I understand it, given the conspiracy theory, in one sense irrelevant. So insofar as he helped to, and I'm not saying that this was necessarily the evidence, but here's a theory, insofar as the theory was that he helped to facilitate a fraud on the Black Elk bondholders by not disclosing the affiliation between Platinum and Beechwood. Whether or not there was actual control is in one sense irrelevant. He thought he was helping, that was the objective, and that's the end of the story. And maybe that explains some of the reasons that the jury acquitted, and I understand that it was sort of a different scheme, but it's a conspiracy that we're talking about, at least with two of the counts of conviction. Your Honor, I understand your question very well. I do think, though, that the record is contrary to that, and that's exactly what Judge Kogan was saying in Rule 33, which is that there's no evidence that Mark Norlick believed that Beechwood was an affiliate, based on the concept that he had, or Platinum had control over management policies. So even in the conspiracy, he has to actually believe. Oh, so what about the evidence, Mr. Burke, of the significant movement of bonds from Platinum to Beechwood? Your Honor— At or around the time, by the way, when this consent solicitation process is being undertaken, and it's of great importance, based on the emails, to the PPVA folks, the Platinum folks. Your Honor, Judge Kogan also addressed this, and the point on that is that if you are shifting, if you're asking friendlies, who are not affiliates, but they are people, they are bondholders or entities that you have some relationship with, want you to succeed for whatever reason, but again, are not controlling you, or you're not controlled by you, you can ask them, hey, we'd like you to do this, because it'll help us out. Is it not evidence? Let's just take this hypothetical. Let's say that it was not just Mr. Levy, but a significant number of high-level executives from Platinum move just at the right time to Beechwood, and then a significant amount of, I guess, number of bonds and other decisions, actually, are made that seem to favor Platinum, and those decisions are made by Beechwood. Would that not be at least circumstantial evidence of some level of control by Platinum to Beechwood that a jury could then latch onto to convict, or at least to determine that there was sufficient control under the indenture? Your Honor, we don't believe so, and we think, and we think so, we don't believe so because, again, to us, and the case law supports this, control is very specific. It means, do you actually control the decisions, the management, the policies of that entity? If all the things you say happen, which did not happen in this case, in the hypothetical that you've offered, even if, at the end of the day, those things happen, but the policies and the management of Beechwood are independent and can make their own decisions, they can say no to all the things that have happened. That doesn't transfer into control, and that was the point that Judge Coghlan was making, and that's the distinction he's making in the Rule 33, is that at the end of the day, all of this, which is what the Rule 29 analysis is saying from his perspective, all of this looks like there's some kind of something going on that's fishy, and we're shifting things to friendlies and things like that, and that's what he's saying in the Rule 29. But on the Rule 33, he's saying, but ultimately, that doesn't matter because there's a big gap in the government's case, and the gap in the government's case is that the only two people to talk about control as it's meant in the Trust Indenture Act are, in terms of the recipient witnesses, were Wallach and Minella, and both of them, government witnesses said that Mark Nordlich did not control Beechwood, and two other people, Thoyer and Taylor, controlled Beechwood. So at the end of the day, the gap in the government's case, which is why we believe Judge Coghlan sees this as a Rule 33 and not a Rule 29, ultimately, is that the government could theoretically, we don't believe they could, but they could call Thoyer or Taylor as witnesses in the trial. They could try to bring other evidence. We believe the evidence would actually show that there, you know, assuming there is a second trial, we believe the evidence would actually be even greater that there's no control from that particular perspective. But that's the distinction that Judge Coghlan was drawing, and it's a very careful distinction, and it's one we think that is compelled by the evidence, and we do not believe he abuses discretion. Sorry, Your Honor. Thank you. You're well over your time. We'll hear from Mr. Shemin. May it please the Court. Good morning. My name is Michael Sommer. I was trial counsel to Mr. Levy. The Rule 29 appeal focuses on whether the government proved beyond a reasonable doubt that my client knew that Beechwood was a legal affiliate of Platinum, and that he understood the control element of that legal standard. And Judge Coghlan was correct when he concluded that government had failed to meet its burden, for he properly found there was no evidence presented by the government that Mr. Levy considered Beechwood to be an affiliate of Platinum, no evidence that he played any role in Beechwood's purchase of black elk bonds from Platinum, and no evidence that he played any role in how Beechwood voted those black elk bonds. Mr. Levy never lied to the investing public, as Ms. Elbert said. There is zero evidence of that in the record, none. The decision of the district court should be affirmed. Let me give you a very quick roadmap of the three things I want to try to get to in this argument. First, I want to explain to this panel how the government has actually misrepresented the record below when it comes to the two main witnesses on this point. Second, I want to address the emails that the government likes to hold up trying to save its case. And third, I want to address the government's repeated argument that Judge Coghlan failed to consider the totality of the evidence. Those are the three things I want to do. So the first, the government has misrepresented the record below. In our opposition brief, we described how Beechwood had engaged lawyers to assure that Beechwood was not a legal affiliate of Platinum, and that people who worked at Beechwood, such as government co-operator Manella and my client, were told that Beechwood was not an affiliate of Platinum. Now, in its reply brief, the government says, no such evidence exists. That is at page 24. But all you need to do is look at 11 pages of the trial transcript, pages 1336 to 1347, to see that the government's position is utterly baseless. The government's own co-operator, Mr. Manella, testified that Beechwood's founders and controlling owners reported multiple times that they had gone to lawyers specifically to assure that Beechwood was not a legal affiliate of Platinum, and that David Levy was part of those discussions. And the import of that evidence cannot be clearer. Mr. Levy did not advance an advice of counsel defense here, as the government disingenuously suggests. The relevance of David Levy learning that lawyers had structured Beechwood so as not to be an affiliate was that it showed he had no criminal intent, just as Judge Kogan recognized. And for the government to suggest that that evidence does not exist is stunning and false. And that's not the only instance. The government's misrepresentation of the record is just as alarming when it comes to Attorney Scheer from Baker-Hotz-Stetler. If you look at pages 34 to 35 of the government's opening brief to this court, it writes the following. I'm going to read it. Quote, Scheer explained that in preparing the consent solicitation, he relied on Dan Small and the defendants, Levy and Nordlich, to provide the number of black belt bonds that PPVA and its affiliates owned. Close quote. According to the government, that number was not correct, and that provides evidence of Mr. Levy's criminal intent. And look, I'm going to tell you this, if that argument is right, if there really was such testimony from Attorney Scheer, then I will concede right now that Judge Kogan committed error. But there's no such evidence. The government's argument is a complete fabrication. They cite two pages in support of this blockbuster testimony from Attorney Scheer that he relied on David Levy, Government Appendix 441 and Government Appendix 470. And when you look at those pages, you will see that what the government is arguing could not be further from the truth, and Judge Kogan knew that, and the government lawyers here today know that. Not a word was uttered by a Scheer about David Levy playing any role in the consent solicitation. In fact, Attorney Scheer acknowledged that he was unaware of any wrongdoing of any kind by Mr. Levy in connection with the consent solicitation. Why does the government feel compelled? So what about the evidence of the emails, Mr. Sommer? And I feel a little old because I know all three of the lawyers involved in this case. But what about the evidence of the emails prior to the consent solicitation? I mean, the argument would be they're trying to figure out what the minimum threshold is for Beechwood to have. So I'm going to answer that in a couple of ways. I was just getting to point number two in my roadmap, which is the emails. First, Judge Loya, let me just address one of the issues you raised in discussing it with Ms. Elbert. When Mr. Levy did get an email from Attorney Scheer about the affiliate rule, yes, that happened. It happened many months before the consent solicitation. And the irony of that argument from the government is that Attorney Scheer then forgot himself about the affiliate rule as he acknowledged before the jury. He messed up. He forgot the affiliate rule. And yet the government once argued that David Levy should be held to a higher standard than the attorney running the deal. Well, was there any evidence that Mr. Levy forgot? There was no evidence that Mr. Levy was involved in the consent solicitation at all, as Judge Kogan found. Let me start. Let me answer. The second way I want to answer your question, Judge Loya, let me just take the emails as a group, OK? Every email the government points to was written by someone other than David Levy. He did not write a single one. And not once did he respond to any of these emails or take any action with any of these emails. Indeed, there's no evidence he ever read these emails or even opened these emails. The government could have procured that evidence. That forensic evidence is easy, but not nothing, nothing. This court has not hesitated to affirm the grant of a Rule 29 or reverse the denial of a Rule 29 when the government's proof rests solely on a defendant having received a document with no conduct. There were many emails where he has copied, including the emails with the chart showing the calculations. I mean, sure, it's possible that he never opened them up, but a reasonable jury could certainly conclude that he did open them up and he did read them and that he knew what was going on. And none of that, Judge Chin, goes to the issue of whether Mr. Levy had an affiliate status between Beechwood and Platinum. All the chart shows, I'm looking at page 70 of the government's brief, all it shows is the count of the bonds that Platinum was aware of. It's aware of the Beechwood bonds because Platinum sold the Beechwood bonds. I mean, this is all argued to the jury, right? And the jury concluded otherwise. Well, that's why we have Rule 29, Judge Chin, because when it's an unreasonable inference, we need the district court to be able to step in. Let me just say one thing about whether Mr. Levy never did anything with respect to these emails other than supposedly receiving them. We cited the court's decisions in Copland and Cassis in our opposition brief on this very point, and yet the government simply ignored them in its reply. I submit that the reason is clear. They have no answer to these cases. And Judge Chin, we also cited your decision in United between a reasonable inference and speculation, the latter being an inference that is in the realm of possibility but is not sufficiently supported to permit a conclusion that the government has satisfied its burden beyond a reasonable doubt. That distinction is critical here because every one of the inferences that the government asks you to draw are speculation. They're not grounded in evidence. For example, going back to that chart. You're making fair arguments, of course, but where's the manifest injustice? I'm not arguing manifest injustice. It's a close case. Judge, I'm not arguing manifest injustice. That's the Rule 33 provisional grant, which I'm not even arguing now. I'm arguing Rule 29, insufficient evidence. Let me give you one more example. The panel, I can't remember which judge it was, raised the issue of Mr. Levy moving to Beechwood as if he was put there to affect a consent solicitation. It was moving to Beechwood just before the consent solicitation. Great. Perfect. You said it better than me, Judge, because that's completely false. He went to Beechwood in January. There was not even an inkling of a suggestion of the need for a consent solicitation at that time because, as you know from the record, they were going to do this private change. But there was this private solicitation. Which would have not required Beechwood to do anything. Remember, there were 12 or more lawyers at three different New York law firms who were guiding Platinum to vote its own bonds to affect indenture change in early 2014. It had zero to do with Beechwood. Nothing whatsoever. And please don't forget what Judge Coggan correctly found, that Mr. Levy played no role, there's no evidence he played any role in the transfer of bonds to Beechwood or the voting of those bonds. If Beechwood is independent, what is its motivation for voting as it did? Well, I think Mr. Burke hit upon it. Beechwood had very significant investments in Platinum, both in the various funds of Platinum. It even loans money to Platinum. And therefore, it had a motive, its own financial motive, to have Platinum succeed. And I can't speculate what the other $600,000 of bond holders had in mind, but certainly from Beechwood's perspective, that was a perfectly legitimate consideration. You're saying Beechwood wanted to help Platinum, and as long as they were not affiliates, that would be okay. And that's exactly what attorneys here testified to in front of the jury. How do you address the one email, I think it's Government Exhibit 625, GA-617, that refers to Beechwood as R-something. It's not R-something. Yes, I can address that easily, Judge. Mr. Levy's not on that. He never received it. He never commented. There's zero evidence he ever saw that. And in fact, that's why Judge Kogan distinguished Mr. Nordling, and the evidence is to him, as to Mr. Levy. My final point in my roadmap, if I can really quickly cover it, the government argues that Judge Kogan failed to consider the evidence in its totality. But all you need to do is read the district court's decision, and you will see that is not so. He repeatedly makes that clear, that he was considering the evidence in its totality. And he got it right. The law does not permit speculation as to an element of a criminal offense. It does not permit even reasonable guesses to satisfy the government's high burden. And it is therefore not enough for the government to line up, guess after guess, and argue that the sum of those guesses somehow amounts to proof beyond a reasonable doubt. I recognize that the standard of review here is de novo. However, I do ask this court to consider, as Mr. Burke alluded to, that in his nearly 15 years on the bench, this is the first and only time Judge Kogan has granted a Rule 29 resulting in the acquittal of a defendant. Once. As you likely know, he is a careful and thoughtful jurist. Here, he sat through nearly three months of trial and was well situated to see that the inferences the government urged below, and is urging here, and the misrepresentations it's made to this court, in an effort to try to save a deeply flawed case, are not reasonable and, as Judge Kogan correctly found, are based on multiple layers of speculation. It cannot be. It cannot be that having emails found in your inbox with no answer and no action can amount to criminal intent. If that is the standard, we are all in danger. Rule 29 exists as a safeguard so that a trial judge can assure that the government has held to its burden of at least, in part, that Mr. Levy did not understand that Beachwood was even indirectly controlled by Platinum. The evidence is 180 degrees the other way, that he was told they were not legal affiliates. And if you look... No, no, no. So there might be competing, as you know, bits of evidence. One showing that he was told or informed that they were not affiliates, but other circumstantial or other direct evidence, but it may be in this case circumstantial evidence is what I think the government is pointing us to, that he, notwithstanding what he was told, understood. Yeah. It's quite an understanding. And I submit, Judge, that evidence simply does not exist. The document they like the most, to try to make that argument, is this chart that we've talked about. And you can look at that, and it says what it says, but it says nothing about the question of what the legal definition of an affiliate is, and what Mr. Levy understood or knew, because there's no evidence of that. And finally, on the Rule 33, I'm not going to argue on that. I simply will point out to you, as we noted in our brief, that the legal standard the government erects, that if you reverse on Rule 33, is not the correct legal standard. There is a different legal standard for the district court to use. And so, since the government doesn't make a factual argument, it makes this legal argument, it is completely wrong as a matter of law. Thank you. Thank you. We'll hear the rebuttal from the government. Thank you, Your Honor. So, to answer Your Honor's question about the number of bonds that voted no, my co-counsel diligently did some arithmetic during the defense argument, and it's approximately 39.97. So, of the 150, we had 98 million vote yes, and not tender, all but 600,000 of which were, we argue, controlled by Platinum, held by Platinum or Beachwood entities. We had the 11 million that tendered. So, to respond first to arguments made by counsel to Mr. Nordlicht, he began with giving you some context of the trial. And the one piece that I would add to that is that this jury did sit a lengthy trial. They listened to three days of summations where, frankly, defense counsel made the exact same arguments they're presenting to this court. They deliberated for a week, and they came back with a mixed verdict. So, this was not a case of a jury that was, you know, sleeping through the trial and writing the government a blank check. It was a careful and conscientious jury. Second, Mr. Burke addressed the apparently conflicting analyses that the tried to justify that by explaining that the rules serve different purposes, which we agree. Again, and we think Archer clarifies, Rule 33 is not Rule 29 light. It's not some relief that you get if the evidence was sufficient to pass Rule 29, but maybe not quite up to snuff. It's supposed to be reserved for manifest injustice. And here, the district court did not identify any credibility with witnesses, did not identify any evidence that was patently incredible or defied physical reality, did not identify any legal defect in the instructions or the evidentiary rulings, and therefore, the district court was bound by the inferences drawn by the jury in issuing the Rule 33 order and did not sufficiently defer to those rulings. And that goes to, applies to, the inference that Putnam and Beachwood were affiliates. Mr. Burke spent considerable time on that issue today and in his brief, but if you look at Judge Kogan's ruling, he finds in the Rule 29 section that there was sufficient evidence to establish that Beachwood and Putnam were affiliates, and he doesn't at least expressly take that back in the Rule 33 ruling. Instead, his focus is on whether or not Mr. Nord looked new of the affiliate status. So all of these arguments about the legal definition of control and whether or not we reached it really fall outside the purview of the order that we're appealing today and could be raised on direct appeal in the event that the conditions would be reinstated. It's about knowledge. Right, that's what Judge Kogan based his ruling on, but I would note that again, this is a circumstantial case and that questions of knowledge and intent, this court, you know, has issued previous rulings on this topic, are particularly well suited for consideration by a jury. The jury reached reasonable inferences as to Mr. Nord's knowledge and intent as Judge Kogan himself ruled in the Rule 29 order that he issued, and he was bound by those inferences in connection with Rule 33. So turning finally, and I see I'm already running out of time, to Mr. Levy's argument. I just wanted to respond to the two accusations of the government misrepresenting the record, and I would join Mr. Sommer in inviting the court to look at the underlying transcripts. The testimony of Mr. Minella about these lawyers who purportedly consulted with Mr. Foyer and Mr. Taylor at the time was very incoherent, at times contradictory, and he never once testified that David Levy was told by lawyers, or that he himself was told by lawyers, that these two parties were not affiliates. Instead, what he testified to was that he was told that Foyer and Taylor consulted with lawyers, and that that's what he had heard, and that there was a meeting that Mr. Levy attended where the concept of affiliate status was discussed. Not even clear what the conclusion was of that Mr. Scheer's testimony about upon whom he relied for accurate information. Mr. Scheer made clear that he relied on Black Elk and by Platinum as the controlling stakeholder of Black Elk to provide him accurate information on the bonds held by affiliates. Mr. Levy, Walla Beachwood employee at the time, is still working at Platinum, and his primary responsibility is managing the Black Elk asset. So I ask you... I thought that part of the theory, and this is the motivation behind my summer, I thought the part of the theory was that Mr. Levy was moved to Beachwood in early 2014, knowing that they would need Beachwood as the vehicle to get the majority of bonds necessary to get this solicitation passed. And his response to me was that at the And even in one sense, before the importance of Beachwood's role in this scheme could have been foreseen. I think that's a fair inference. The public consent solicitation didn't happen until, you know, late spring, early summer, into late summer of 2014. Mr. Levy started at Beachwood in January of 2014. But he was, again, in our view, installed there as the chief investment officer of Beachwood in order to, you know, essentially, Platinum used Beachwood as its tool in a variety of respects. They put a bunch of assets, and we covered this a bit in our brief, they took a bunch of assets off their own books, put them on Beachwood's books to get them off of their books. They kind of used it for a variety of mechanisms in support of their business, which is one of the reasons that we... But in terms of the specific public consent solicitation process, that did not begin until several months after Mr. Levy went over to Beachwood. And then just one... Sorry, go ahead. You can finish up. Okay. Just very quickly, Mr. Summer's final point was that our only evidence was that Mr. Levy received emails. Obviously, we dispute that. And I would in particular refer the court to the evidence we presented about Mr. Levy's comments at the Black Elk management meeting that Joe Bruno testified about, where he reassured the head of Black Elk that the consent solicitation deal was covered. What does that mean, covered? We believe it means that the outcome was guaranteed. Let me ask a more precise question. What did the government argue to the jury covered meant? We argued it meant this transaction is a done deal. It hasn't even started yet, but the outcome is going to be guaranteed. Don't worry about it, right? Because this comment is just after the then CEO of Black Elk is saying, this is never going to happen. You're never going to hear back from anybody. And then Levy reassures Jeff Schultz, it's covered. It's covered. Like, don't worry about it. We have this on lock, basically, which as we know, we did. That doesn't necessarily shed light on whether he knew or totally understood that Beachwood was under the control, as the indenture requires, or affiliated with Platinum. It just says... I would argue in that implicitly, it does. As we talked about before, there was no way for this vote to succeed without the fact that Platinum controlled these covert, undisclosed bonds that were going to vote yes. So in order for Mr. Levy to be so assured of the outcome, he would had to have known we have all these votes that are going to vote yes. They're not going to be excluded from the vote. They're not going to be disclosed to the bondholders. And we know they're going to vote yes because we control them and we dictate how... It does sort of corroborate together with all the other evidence, again, looking holistically, Levy's knowledge and intent. Thank you very much. Thank you all for your very fine arguments. The court will reserve decision.